# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-SA-01343-COA

LINDA K. NEWTON                                                    APPELLANT

v.

PUBLIC EMPLOYEES' RETIREMENT SYSTEM                               APPELLEE
OF MISSISSIPPI

DATE OF JUDGMENT:              08/24/2018
TRIAL JUDGE:                   HON. JEFF WEILL SR.
COURT FROM WHICH APPEALED:     HINDS COUNTY CIRCUIT COURT,
                               FIRST JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:        MICHELLE DEAN EASTERLING
ATTORNEY FOR APPELLEE:         SAMUEL MARTIN MILLETTE
NATURE OF THE CASE:            CIVIL - STATE BOARDS AND AGENCIES
DISPOSITION:                   REVERSED AND RENDERED - 07/21/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     In 2006, Linda Newton, a kindergarten teacher's assistant at a public school, applied

for non-duty-related disability retirement benefits from the Public Employees' Retirement

System of Mississippi (PERS).  The PERS medical board denied Newton's application,

finding there was insufficient objective evidence to support Newton's claim that her medical

condition prevented her from performing her duties as a kindergarten teacher's assistant.

Newton appealed to the PERS disability appeals committee.  The committee recommended

that Newton's application for disability benefits be denied, and the board of trustees adopted

the committee's recommendation.  Then Newton appealed to the Hinds County Circuit Court,

which reversed PERS's decision and remanded for a hearing.

¶2.    After a hearing, the committee recommended denial again of Newton's application for disability benefits.  The board of trustees adopted the committee's recommendation.  Newton filed another appeal to the circuit court, and the court affirmed PERS's decision.  Now, Newton appeals, claiming that PERS's decision was arbitrary and capricious and was not supported by substantial evidence.

¶3.    After our review, we find PERS's decision was not supported by substantial evidence and therefore was arbitrary and capricious.  We reverse and render the circuit court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶4.    Newton was a kindergarten teacher's assistant for the Monroe County School District until she resigned on July 31, 2006.[1]  In August 2006, Newton applied for non-duty-related disability benefits with PERS, indicating that she was unable to perform her job duties as a result of a medical condition.  According to Newton, she had been diagnosed with cerebral palsy, and her condition had deteriorated to the point where she had constant pain in her back and legs, she suffered from frequent falls, and she had loss of dexterity.

¶5.    In August 2006, Superintendent Jimmy Dahlen completed a PERS Form 6B (Employer's Certification of Job Requirements).  Dahlen indicated that Newton's job as a kindergarten teacher's assistant frequently required simple grasping.  Dahlen wrote that Newton's job as a kindergarten teacher's assistant rarely required writing, walking, sitting,

---

[1] Newton's last day of work was in May 2006.

2

standing, bending, lifting less than ten pounds, and pushing or pulling. Finally, he indicated that Newton's job as a kindergarten teacher's assistant never required supervisory responsibilities, squatting, kneeling, crawling, stair climbing, ladder climbing, lifting more than ten pounds, fine manipulation, overhead work, or unprotected heights.[2] In Dahlen's opinion, Newton was able to perform her job as a teacher's assistant.

¶6.     In October 2006, Dr. James Halsey—Newton's neurologist—completed a PERS Form 7 (Statement of Examining Physician). According to Dr. Halsey, Newton's primary diagnosis was spastic left hemiparesis. Dr. Halsey attached a note from October 2006 to the form, which stated, "This is a case of cerebral spastic left infantile paralysis i.e. due to a cerebral lesion. It is nicely shown on the MRI brain scan but there is no treatment." The note also indicated that Newton had back pain. Dr. Halsey concluded that Newton was "unable to work in any capacity requiring more than occasional brief standing or walking up to 50 feet." And he believed that Newton was permanently disabled.[3]

¶7.     Dr. Laura Washington also completed a PERS Form 7 (Statement of Examining Physician). According to Dr. Washington, Newton's primary diagnosis was cerebral palsy and left hemiparesis, and Newton's secondary diagnosis was mild degenerative disc disease. Dr. Washington indicated that she did not perform evaluations for permanent partial impairments, but she did not dispute the impairments Dr. Halsey noted. According to Dr.

---

[2] There were several other tasks that Dahlen indicated were never required, but those tasks are not relevant to this case.

[3] In another note dated April 2006, Dr. Halsey stated, "I think it with the associated back pain is disabling for [Newton's] work as an assistant elementary teacher where she has to chase young children."

Washington, Newton was "at her current baseline," and she did not expect significant improvement. Rather, Dr. Washington believed that Newton's pain and symptoms of weakness would likely progress.

¶8. In office notes from February 2005 to October 2006, Dr. Washington noted that Newton had polio as a child, chronic back problems, mild chronic degenerative joint disease, degenerative disc disease, disc bulging, disc space narrowing, osteoarthritis of the lumbar spine, lumbar radiculopathy, fibromyalgia pain, and mild depression. She also noted that Newton had experienced recurring falls due to weakness in her leg. In a note from April 2006, Dr. Washington did not dispute Dr. Halsey's diagnosis; however, Dr. Washington stated that she "[did] not feel comfortable . . . just chalking it all up to cerebral palsy."

¶9. In November 2006, Dr. David Collipp conducted an independent medical examination of Newton at PERS's request. According to Dr. Collipp, Newton stated that she had some pain in her back and legs. She also stated that she had experienced increasing weakness with her left arm. And Newton reported "significant problems with activities of daily living" and a "gradual decline in function . . . over the last several months."

¶10. In his report, Dr. Collipp diagnosed Newton with "spastic hemiplegia trooper palsy since [she was] 18 months of age." Dr. Collipp noted that Newton's medical records indicated that she also had fibromyalgia and had received treatment for mild depression. And Dr. Collipp noted that Newton had balance problems, her medical records documented multiple falls, she had mild wasting in her left arm, and she had mild spastic posturing in her left hand. But according to Dr. Collipp, Newton's walking was acceptable, particularly with

4

a cane, and she had sufficient physical strength. Dr. Collipp concluded that "based upon the available information," Newton was "physically capable of performing light duty, with a maximum lift of only 20 lbs., however such lifting should be rare at best."

¶11. In January 2007, the PERS medical board determined that there was insufficient objective evidence to support Newton's claim that her medical condition prevented her from performing her duties as a teacher's assistant. Subsequently, Newton appealed the medical board's decision to the committee.

¶12. At a hearing before the committee in April 2007, Newton testified that she had been diagnosed with polio as a child, but that after an MRI Dr. Halsey diagnosed her with cerebral palsy and told her that she had suffered a brain stroke when she was eighteen months old.[4] She also testified that she had kidney problems, bulging discs, degenerative disc disease, degenerative joint disease, and fibromyalgia. Additionally, Newton testified that she had experienced depression and panic attacks. At the time, Newton was prescribed Atarax, Effexor, Gabapentin, Hydrochlorothiazide, Naprosyn, and Skelaxin.

¶13. Newton testified about her pain, balance issues, weakness, and physical exhaustion. According to Newton, her back pain began a few years earlier but had steadily worsened. At the time, she had pain in her back and hip every day, and she could no longer sit, stand, or walk for more than thirty minutes. Newton also testified she had been falling for years,

---

[4] Newton testified she had an MRI in 1996, and it showed that the part of her brain that controlled mobility, flexibility, and balance was "missing." However, at the time, she believed it was related to her polio diagnosis.

5

but her falls had become more frequent.[5]  And she testified that she started using a cane. Additionally, Newton testified that she had increasing weakness and limited use of her left hand.  According to Newton, she could no longer handle her day-to-day duties at home or work.

¶14.    With respect to her job as a teacher's assistant, Newton testified that from 2005 to 2006 she assisted three kindergarten teachers and was required to bend over small desks, help students with their work, hand out and grade papers, take the students to the cafeteria, make copies, retrieve books from the library, straighten bookshelves, lift boxes of paper and books, dust, sweep, move desks, hang bulletin boards, and climb ladders.  Newton testified that she did not believe that Superintendent Dahlen knew what her job duties entailed.  However, she believed that Russell Thomas, the principal and her immediate supervisor, had a better understanding of her duties.[6]

¶15.    According to Newton, Dr. Halsey told her that her condition would progressively worsen.  However, Dr. Joseph Blackston, one of the committee members, stated that although Newton could have cerebral palsy, "it's not usually a progressive thing."  Dr. Blackston then recognized that Newton's back and hip pain was what Dr. Halsey seemed to feel was concerning for Newton's work and that they were likely a result of degenerative diseases.  Newton testified that she felt as though her doctors had not given her clear answers, which was one reason why she began seeing Dr. Donald Smith, D.O.

---

[5] Newton testified that she sometimes fell once per month but had stumbled several times in one week.

[6] Thomas was unavailable to testify at the hearing.

¶16.    In February 2007, Dr. Smith assessed Newton as having polio with left-sided weakness and disease, cerebral palsy, bulging discs, degenerative disc disease, degenerative joint disease, fibromyalgia, major depressive disorder, anxiety attacks, and allergic rhinitis. He noted that Newton could not sit, stand, or walk for more than thirty minutes at a time, and she could not squat, bend, kneel, or climb.[7] Dr. Smith also noted that Newton could not use her left hand and had carpal tunnel in her right hand. Nor could she lift more than ten pounds. Dr. Smith noted that Newton fell occasionally, her right leg "[did not] seem to work very well," and that she had significant weakness in her left side with gross abnormalities in her left limbs. And he noted that Newton walked with a cane or walker. Finally, Dr. Smith noted that Newton had been disabled since 2006.

¶17.    After the hearing, in June 2007, the committee recommended that Newton's claim for disability benefits be denied. In its "Proposed Statement of Facts, Conclusions of Law and Recommendation," the committee opined that Newton's diagnosis of cerebral palsy was incorrect. The committee stated that even if the diagnosis was correct, Newton had "function[ed] adequately for many years." According to the committee, Newton's "problem . . . [wa]s mild and hardly noticeable" and "the only problem [wa]s that Ms. Newton [wa]s a little wobbly when she walk[ed]." The committee found that there were no significant physical findings and no "significant change in [Newton's] medical condition over the last five or so years, except maybe [her] gait [wa]s a little less stable." According to the committee, Newton's medical records did not show disabling back pain or weakness from

_____

[7] Dr. Smith indicated that Newton could occasionally bend at the waist.

the cerebral palsy.[8]  And while Newton probably had some back pain, the committee stated that it did not appear to be disabling.  According to the committee, "Ms. Newton just threw in the hat in May 2006" even though her employer thought she could still do her job.  And the committee concluded that "[t]he evidence is persuasive that Ms. Newton's decision to quit work was based on something other than the actual medical problems she has."  Ultimately, the board of trustees adopted the committee's recommendation to deny Newton's claim.

¶18.    In July 2007, Newton appealed to the Hinds County Circuit Court.  On August 10, 2010, Judge Yerger entered an order finding that the "[c]ommittee based its opinion in disregard to medical evidence contained in the record when it opined regarding the 'impossibility' of [Newton's] diagnosis of cerebral palsy."   Judge Yerger noted that "[s]everal doctors in the record agreed with, or at least failed to dispute, Dr. Halsey's finding of cerebral palsy" and that, therefore, the determination of the effect of Newton's condition was arbitrary and capricious.  Judge Yerger also noted that "the record reflect[ed] objective evidence of [Newton's] back problems."  And Judge Yerger held that "the determination of disability ultimately require[d] remand, due to the [c]ommittee's failure to ascertain [Newton's] job requirements."  Judge Yerger stated:

> In its decision, the [c]ommittee admitted that [Newton] had back pain, but opined that the pain did not rise to the level of disability. . . .  Without permitting [Newton] to provide testimony from her immediate supervisor,

---

[8] The committee noted that Newton had mild degenerative changes in her lower spine, but testing was unable to document any evidence of radiculopathy.  The committee also noted that none of the examinations documented a significant left-sided weakness.  Rather, they documented "just a little atrophy on the left side."

8

Principal Thomas, regarding the applicable level of activities required of [Newton's] job, this determination lacks substantial evidence. Although Dr. Collipp opined that [Newton] possessed the capabilities to work at a light level, this opinion is substantive only with full knowledge of the actual amount of physical exertion required at [Newton's] job. . . . Therefore, the [c]ourt remands this case to the [c]ommittee for further findings regarding [Newton's] job requirements, including testimony from [Newton's] immediate supervisor.

¶19. The case was then reversed and remanded for "further factual findings regarding [Newton's] diagnosis of cerebral palsy and regarding the requirements of [Newton's] position as a teacher assistant."

¶20. At a hearing before the committee in January 2011, Thomas testified that Newton's job required walking, bending, stooping, crouching, kneeling, lifting less than ten pounds, grading papers, writing on the chalk board, cutting out bulletin board materials and hanging bulletin boards, moving chairs, pushing book/TV carts, and taking students to the restroom, lunchroom, playground, and pick-up lines. He also testified that Newton's job required fine manipulation. According to Thomas, Newton's job duties did not include climbing ladders.

¶21. Thomas explained that Newton had previously been a teacher's assistant for second grade but was moved to kindergarten for the 2005-2006 school year. Thomas acknowledged that kindergarten was more demanding because the students' needs were greater and the tables and chairs were shorter. But he testified that moving Newton to a higher grade was not an option.

¶22. Thomas testified that he did not recall that Newton had any problems performing her job. He described Newton as a truthful person and not a complainer. Thomas admitted that he did not know the details of Newton's medical condition. But he speculated that many of

9

Newton's twenty-nine absences were due to health problems. And he was not surprised that Newton wanted to apply for disability benefits. Thomas testified that on May 1, 2006, Newton was knocked down by a child and then began using a cane.[9] Finally, Thomas testified that he told Newton not to do anything that made her uncomfortable and that he wanted her to return the next school year.

¶23.    Angie Crowe, a teacher's assistant who had worked alongside Newton, also testified at the hearing. Crowe testified that Newton's job required bending over tables; taking students to-and-from activities; bus and playground duty; making copies; sometimes lifting very heavy boxes of paper; updating bulletin boards; climbing step-ladders and chairs; reaching to hang materials; moving tables, chairs, desks, and TV carts; and packing/unpacking everything at the beginning/end of the year. Crowe testified that there were more physical requirements in kindergarten than other grades because the students were more dependent.

¶24.    Crowe explained that when she first met Newton, Newton was able to walk and bend. But she became slower and was not able to accomplish things the way that she did before. Crowe testified that during the 2005-2006 school year, Newton had difficulty walking, climbing stairs, and with mobility in one of her hands.[10] She testified that "we would all pitch in and try to cover her duties so she wouldn't have to walk so much." And Crowe

---

[9] Newton explained that this was not her first fall. She testified that she had previously tripped over a backpack, that she almost tripped on the stepladder several times, and that she had fallen at home.

[10] Crowe also suggested that Newton had difficulty with sitting at tables, stooping, and standing.

testified that she tied Newton's shoes for her several times. According to Crowe, "[m]ost of the time [Newton] really didn't seek assistance, but if I [saw] that she needed help, I would . . . tie her shoe for her . . . ." Finally, Crowe testified that Newton enjoyed working but was afraid that her condition was worsening and that the school would not ask her to return.

¶25. Newton also testified at the second hearing. Newton testified that kindergarten was more demanding than second grade. She explained that working at shorter tables aggravated her back the most. And she suggested that the kindergarten teachers were not as aware of her limitations, compared to the second-grade teacher she had previously assisted. Newton testified that she felt like she was taking people away from their jobs because of her inability to perform her own job. And she reiterated that her pain and falling had progressively worsened.

¶26. After the hearing, the committee recommended that Newton's claim for disability benefits be denied again. In its "Proposed Statement of Facts, Conclusions of Law, and Recommendation," the committee stated:

> The key question for PERS with regard to the determination of whether Ms. Newton is eligible for PERS disability is whether the claimant, Ms. Newton, can or cannot perform the necessary functions of her job as an assistant teacher, a diagnosis of Cerebral Palsy notwithstanding. The causation of her long-standing deficits is not the issue. Ms. Newton's diagnosis of Cerebral Palsy, whether it is correct or not, or whether it happened at birth or from a later brain injury, is of no true consequence to a disability determination. Having Cerebral Palsy does not entitle a person to disability under PERS law. The PERS issue is whether Ms. Newton is physically able to perform her job.

¶27. The committee then noted that Newton claimed that she suffered from, among other things, back pain, bulging discs, fibromyalgia, arthritis, and fatigue. But according to the

11

committee, "[t]he record [did] not support these diagnoses or debilitation from any of these or any combination of these together."

¶28. With respect to Newton's job requirements, the committee recognized that an employer generally is not able to testify as to day-to-day job requirements. However, the committee found that "[t]he superintendent [(Dahlen)] state[d] that Ms. Newton's job [did] not require that she squat, kneel, crawl, climb a ladder, or climb stairs, and that she was never required to lift over 10 pounds." According to the committee, "[t]hese statements were also testified to by [Principal] Thomas." And the committee noted that some of Newton's tasks, such as climbing, were not in her job description.

¶29. According to the committee, the general physical differences between second grade and kindergarten were "not significant." The committee then noted that other assistants helped Newton, Newton performed her job well enough that she was offered to come back, and Newton's supervisor would have continued to make accommodations for her. Ultimately, the committee found that Newton was physically able to perform her job, and the board of trustees adopted the committee's recommendation to deny Newton's claim.

¶30. In July 2011, Newton filed a second notice of appeal to the circuit court claiming that PERS's decision was arbitrary and capricious and was not supported by substantial evidence. Several years later, on August 24, 2018, in a two-page opinion, Judge Weill affirmed the denial of Newton's claim. Judge Weill found that the decision was neither arbitrary nor capricious and that it was supported by substantial evidence. Judge Weill found that Newton's "diagnosis was an explanation for her physical limitations and did not have any

12

effect on her current well-being." Judge Weill further found that "[t]estimony from Ms. Newton's supervisor supported the board's contention that Ms. Newton was still able to perform her duties as a teacher's assistant."

¶31. Subsequently, Newton filed a motion to alter or amend the judgment. Then she filed a notice of intent to withdraw her motion and filed a notice of appeal. On appeal, Newton claims that PERS's decision was arbitrary and capricious and was not supported by substantial evidence.

## STANDARD OF REVIEW

¶32. On appeal, "[t]he issue before this Court is not whether there was evidence in support of [Newton's] disability, but whether there was substantial evidence to support the finding of [PERS]." *Doyle v. Pub. Emps.' Ret. Sys.*, 808 So. 2d 902, 905 (¶8) (Miss. 2002). A PERS determination "must remain undisturbed unless [it]: (1) is not supported by substantial evidence, (2) is arbitrary or capricious, (3) is beyond the scope or power granted to the agency, or (4) violates the claimant's constitutional rights." *Davidson v. Pub. Emps.' Ret. Sys.*, 219 So. 3d 577, 581 (¶15) (Miss. Ct. App. 2017) (quoting *Pub. Emps.' Ret. Sys. v. Howard*, 905 So. 2d 1279, 1284 (¶13) (Miss. 2005)). "'Substantial evidence' has been defined by this Court as 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion.'" *Id*. (quoting *Knight v. Pub. Emps.' Ret. Sys.*, 108 So. 3d 912, 915 (¶13) (Miss. 2012)).

¶33. This Court has held that "[a] rebuttable presumption exists in favor of PERS's decision, and the claimant has the burden of proving the contrary." *Id*. (quoting *Dearman*

13

*v. Pub. Emps.' Ret. Sys.*, 205 So. 3d 1100, 1103 (¶10) (Miss. Ct. App. 2016)). Furthermore, this Court is "obligated to afford the agency's determinations of credibility in the fact-finding process substantial deference." *Id*. (quoting *Pub. Emps.' Ret. Sys. v. Cobb*, 839 So. 2d 605, 609 (¶12) (Miss. Ct. App. 2003)). "We will not 're-evaluate the evidence' or 'make our own determination of the trustworthiness of some particular testimony.'" *Id*.

## DISCUSSION

¶34.    In August 2010, Judge Yerger found that PERS disregarded "medical evidence contained in the record when it opined regarding the 'impossibility' of [Newton's] diagnosis of cerebral palsy." Judge Yerger also found that "the record reflect[ed] objective evidence of Newton's back problems." And Judge Yerger remanded the case for "further factual findings regarding [Newton's] diagnosis of cerebral palsy and regarding the requirements of [Newton's] position as a teacher assistant."[11]

¶35.    After a second hearing, PERS stated:

> The key question for PERS with regard to the determination of whether Ms. Newton is eligible for PERS disability is whether the claimant, Ms. Newton, can or cannot perform the necessary functions of her job as an assistant teacher, a diagnosis of Cerebral Palsy notwithstanding. The causation of her long-standing deficits is not the issue. Ms. Newton's diagnosis of Cerebral Palsy, whether it is correct or not, or whether it happened at birth or from a later brain injury, is of no true consequence to a disability determination. Having Cerebral Palsy does not entitle a person to disability under PERS law. The PERS issue is whether Ms. Newton is physically able to perform her job.

We agree. This Court has held that "there is no requirement for a specific medical condition if the evidence supports the inability to continue work or disability." *Poole v. Pub. Emps.'*

---

[11] PERS did not appeal the circuit court's decision.

14

*Ret. Sys.*, 57 So. 3d 13 (¶19) (Miss. Ct. App. 2010). Furthermore, the committee's inability to find the specific cause of a claimant's pain is not fatal to a finding of disability. *Id*. at 16 (¶22).

¶36. Despite acknowledging Newton's "long-standing deficits," PERS found that "[*t*]*he record* [*did*] *not support these diagnoses* or debilitation [therefrom]." (Emphasis added). This finding is not supported by the record. As noted by Judge Yerger, there is "objective evidence of [Newton's] back problems." PERS acknowledged that Newton had mild degenerative changes in her lower spine and that she "probably" had some back pain. Furthermore, Judge Yerger noted, "Several doctors in the record agreed with, or at least failed to dispute Dr. Halsey's finding of cerebral palsy."

¶37. Dr. Halsey diagnosed Newton with spastic left hemiparesis and back pain and believed that Newton was permanently disabled. Dr. Washington did not feel comfortable "chalking it all up to cerebral palsy," but she did not dispute the diagnosis. Dr. Washington noted that Newton had chronic back problems, mild chronic degenerative joint disease, degenerative disc disease, disc bulging, disc space narrowing, osteoarthritis of the lumbar spine, lumbar radiculopathy, fibromyalgia pain, and mild depression. Likewise, Dr. Smith assessed Newton as having polio with left-sided weakness and disease, cerebral palsy, bulging discs, degenerative disc disease, degenerative joint disease, fibromyalgia, major depressive disorder, anxiety attacks, and allergic rhinitis. And Dr. Smith noted that Newton had been disabled since 2006. Finally, Dr. Collipp diagnosed Newton with "spastic hemiplegia trooper palsy." Although Dr. Collipp opined that Newton was "physically

15

capable of performing light duty," Judge Yerger noted that "this opinion is substantive only with full knowledge of the actual amount of physical exertion required at [Newton's] job."

¶38.    With respect to Newton's job requirements, PERS continues to rely on the Employer's Certification of Job Requirements that Dahlen completed.  PERS notes that according to Dahlen, Newton's job did not require her to "squat, kneel, crawl, climb a ladder, or climb stairs, and that she was never required to lift over 10 pounds."  According to PERS, "[t]hese statements were also testified to by Mr. Thomas" during the hearing on remand. Additionally, PERS notes that the general physical differences between second grade and kindergarten "are not significant."

¶39.    In the Employer's Certification of Job Requirements, Dahlen indicated that Newton's job frequently required simple grasping.  It rarely required writing, walking, sitting, standing, bending, lifting less than ten pounds, and pushing or pulling.  And it never required squatting, kneeling, crawling, ladder climbing, stair climbing, lifting more than ten pounds, fine manipulation, overhead work, or unprotected heights.  Although Thomas, Newton's immediate supervisor, agreed that Newton's job duties did not include climbing or lifting more than ten pounds, he testified that Newton's job did require walking, writing, bending, stooping, crouching, kneeling, hanging bulletin boards, moving chairs, pushing book/TV carts, and fine manipulation.  Furthermore, Thomas, Crowe, and Newton testified that kindergarten was more demanding because the students' needs were greater.

¶40.    With respect to Newton's ability to perform her job, PERS notes that Newton performed her job well enough that she was offered to come back, other assistants helped

16

her, and Newton's supervisor would have continued to make accommodations for her. However, according to Newton, she had constant pain, loss of dexterity, and frequent falls.[12] She testified that she could no longer sit, stand, or walk for more than thirty minutes. And Newton testified that she felt like she was taking people away from their jobs because of her inability to perform her own job. Crowe confirmed that Newton had become slower and had difficulty performing some of the duties of her job. And Thomas testified that moving Newton to another grade was not an option.

¶41. Finally, we note that Newton was approved for disability by the Social Security Administration (SSA). "While PERS is not bound by the determination of the SSA that a person is disabled, such a determination may be considered as further evidence in support of disability." *Howard v. Pub. Emps.' Ret. Sys. of Miss.*, 971 So. 2d 622, 628 (¶15) (Miss. Ct. App. 2007) (citing *Pub. Emps.' Ret. Sys. v. Allen*, 834 So. 2d 50, 54 (¶12) (Miss. Ct. App. 2002)).

¶42. As discussed, PERS continued to rely on the PERS Form 6B (Employer's Certification of Job Requirements) that Dahlen completed. Dahlen's assessment of Newton's job requirements has no basis in the record. Therefore, PERS's continued reliance on the form was arbitrary and capricious.

¶43. After reviewing the record before us, and for the reasons set forth in this opinion, we determine PERS's finding that Newton was not disabled and its decision to deny Newton's

---

[12] PERS stated that there was no "documentation of the frequent falls that Ms. Newton alleges." However, according to Dr. Collipp, Newton's "medical record documents multiple falls."

17

application for non-duty-related disability retirement benefits were not supported by substantial evidence and are therefore arbitrary and capricious. *See Knight*, 108 So. 3d at 916 (¶13) ("[I]f an agency's decision is not based on substantial evidence, it necessarily follows that the decision is arbitrary and capricious.").

¶44. Because we find that PERS's decision that Newton was not disabled was not supported by substantial evidence, we reverse and render the circuit court's judgment affirming PERS's order denying non-duty-related disability retirement benefits. Newton is entitled to benefits from the date of application.

¶45. **REVERSED AND RENDERED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR. LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ. J. WILSON, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

¶46. I concur with the majority's decision to reverse and render the circuit court's judgment. I write separately to express my concerns with the unconscionable delay in this case.

¶47. Newton first filed for disability benefits in 2006. PERS subsequently denied her request. On July 24, 2007, Newton appealed to the circuit court. On August 10, 2010, almost three years later, the circuit court reversed and remanded the case for further factual findings. On remand, PERS again denied Newton's request. On July 26, 2011, Newton filed a second appeal to the circuit court. On November 14, 2011, PERS's attorney filed the

18

transcript from the PERS hearing. Newton filed her brief on April 18, 2012, and PERS filed its response on June 18, 2012. Newton filed her reply brief on August 1, 2012. From that point, nothing happened. For **four and a half years**, the case sat on the circuit court judge's desk until February 10, 2017, when Newton filed a motion for a status conference. Again, nothing happened. Finally, six years after the reply brief was filed, on August 24, 2018, the circuit court issued a two-page order confirming the denial of Newton's benefits. Newton was finally able to appeal from that denial to the supreme court, which assigned the case to this Court. Now, after fourteen years, this Court finally administers to her the justice she deserves.

¶48. The Mississippi Constitution states, "All courts shall be open; and every person for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, **and right and justice shall be administered without sale, denial, or delay**." Miss. Const. art. 3, § 24 (emphasis added). Courts remedy delay in certain cases and under certain circumstances. Courts dismiss criminal cases when the State has failed to comply with the constitutional or statutory speedy trial rights. Courts dismiss actions for failure to prosecute or failure to file within the time prescription. Courts deny affirmative defenses to those who fail to plead them in a timely manner. But what can a party do in the civil arena when the delay is wholly attributable to the employee elected by the people and paid by the government to fairly and lawfully decide issues as presented here? The delay remedy may be elusive in certain situations. The parties could, in theory, petition for writ of mandamus, but that means squaring off against the very judge who is deciding whether the person gets

19

benefits or not. The Mississippi Constitution places the no-"delay" burden on the government, not the citizens. Thus, I cannot countenance such an egregious delay of constitutional proportions when it is so clearly evident before us.

¶49. What if a chancellor delayed issuing a final ruling on a child-custody matter for six years? The parties, the children, and society have a vested interest in not only a timely ruling but also in presenting that chancery court's decision to an appellate court for review. If the chancery court took years to render a final decision, then that child's case is effectively decided by one person—without appellate review. This Court does not review temporary orders but only final orders. In the case of a lengthy delay on the final order of custody, temporary orders could effectively be enforced on that child for the remainder of his or her childhood without appellate review. That is not how the judiciary was designed to work. Nor is that how the disability-review process was designed to work. I have said previously in cases before this Court, although a single case may be just another case to be worked on by the lawyers and judges, it is everything to the parties.

¶50. For six years, Newton waited. She did not receive one penny of disability benefits because her case sat on the desk of the judge who was assigned the appeal. The record was made. The opinion of the commission had long been put to paper. Yet there the case sat—stuck to a desk of a judge who failed for some reason to render a timely decision. It is interesting to note that Mississippi Code Annotated section 9-4-3(4)-(5) (Rev. 2019) requires both this Court and the Mississippi Supreme Court to issue a decision "within two hundred seventy days (270) after the final briefs have been filed with the court." Both appellate

20

courts work tirelessly to comply with that framework and guideline. Considering the lengthy delay that occurred in this case, perhaps it is time for a rule requiring a trial court to have a similar timeline when sitting as an appellate court.

¶51.    Seven years to rule on an appeal from 2011 on disability is simply unconscionable and offensive to article 24 of the Mississippi Constitution, which mandates justice shall be delivered without "delay." Delay is a threat to a civil and orderly society where redress for wrongs are addressed in the courts instead of the streets. I remember what it was like to practice law and help move cases through a crowded and overworked judiciary. I pledged upon election to this position to try my earnest to never forget the struggles of everyday trials and the practice of law. I understand that the pursuit of truth and justice is sometimes slow and deliberate in the interest of getting it right. Be that as it may, we must do better as a judiciary than the delays that happened in this case. Citizens come to the judiciary to seek justice, and the timely delivery of that justice brings consistency and credibility to our courts. We must strive to ensure that the ancient and eternally applicable legal maxim does not come to fruition on our watch—justice delayed is justice denied.

**GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**